UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-82316-CIV-SMITH/MATTHEWMAN

CHARLES DIXON,

     Plaintiff,

v.

KILOLO KIJAKAZI[1],
Acting Commissioner of Social Security Administration,

     Defendant.

_____/

FILED BY ___KJZ___ D.C.

May 26, 2022

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - West Palm Beach

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON MOTIONS FOR SUMMARY JUDGMENT [DEs 27, 30]

THIS CAUSE is before the Court upon Plaintiff, Charles Dixon's ("Plaintiff") Motion for Summary Judgment [DE 27] and Defendant, Commissioner of Social Security's Motion for Summary Judgment with Supporting Memorandum of Law and Response to Plaintiff's Motion for Summary Judgment [DEs 30, 31]. This matter was referred to the Undersigned by United States District Judge Rodney Smith. [DE 2]. The issue before the Court is whether the record contains substantial evidence to support the denial of benefits to the Plaintiff and whether the correct legal standards have been applied. *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Therefore, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted for Andrew Saul as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. 405(g).

## II. <u>FACTS</u>

On May 22, 2017, Plaintiff protectively filed an application for supplemental security income, alleging disability beginning on August 1, 2015. [R. 15].[2] The claim was denied initially on September 20, 2017, and again upon reconsideration on January 10, 2018. [R. 15]. Following a telephonic hearing on May 13, 2020, the Administrative Law Judge ("ALJ"), Sylvia H. Alonso, issued a decision on June 1, 2020, denying Plaintiff's request for benefits. [R. 15–29]. A request for review was filed with the Appeals Council and denied on October 29, 2020. [R. 1–6].

### A.  <u>Hearing Testimony</u>

At the time of the May 13, 2020 telephonic hearing, during which he was represented by counsel, Plaintiff was 29 years old. [R. 27, 37, 56]. The ALJ had a vocational expert, Mia Heikkila, attend the hearing as well. [R. 37]. Plaintiff testified as follows.

Plaintiff is single, never married, and has no children. [R. 44]. He lived with his mother and girlfriend at the time of the hearing. [R. 44]. His brother's children sometimes lived in the residence too. [R. 44]. Plaintiff has no source of income. [R. 44]. His mother and girlfriend both work during the day and split the household bills. [R. 44]. Plaintiff has a driver's license, but he only drives an average of once per week to the nearby store and back. [R. 44].

Plaintiff graduated from high school and went to college for one year but could not finish due to attendance and health issues. [R. 46]. He tried again to go to college the year before the hearing but "couldn't do it." [R. 46]. Plaintiff has a security officer license, which may or may not still be active, because he tried to work security while he was 18 and going to college to support

---

[2] All references are to the record of the administrative proceeding filed by the Commissioner in Docket Entry 22.

himself. [R. 47]. However, the job involved a lot of standing and walking up the stairs, which was hard on him. [R. 47]. He was eventually laid off. [R. 47]. Plaintiff also has a license to carry a firearm. [R. 47].

Plaintiff worked at Checkers full-time in 2007 for about eight months to a year. [R. 47–48]. He mopped floors, took out the trash, made orders, lifted boxes, and emptied trucks, freezers, and coolers. [R. 48]. In 2014, he worked for U.S. Security Associates as a security guard in a retail setting for about three months on a full-time basis. [R. 48]. That job involved patrolling plazas and conducting crowd control for 12-hour shifts, during which Plaintiff walked for 10 hours and stood for 12 hours. [R. 56]. Plaintiff also worked at Popeye's in Orlando doing fast-food work, cooking, taking trash out, and mopping floors, for about a month or a month and a half. [R. 49, 56]. His boss did not like his work ethic. [R. 49]. That job was full-time, and Plaintiff had to lift boxes of up to 50 pounds. [R. 50, 57]. Plaintiff worked full-time at the Village of North Palm Beach as a utility worker for about two to three months picking up and taking out trash, mopping floors, making orders, and selling things. [R. 50]. He was not generally lifting or carrying more than 20 pounds, but he did sometimes lift 50 pounds. [R. 50, 57]. He worked full-time at Stephen Denny, an AC company, where he was a driver for the parts department for about three months. [R. 50–51]. At Stephen Denny, he lifted and carried up to 50-60 pounds and reinjured himself lifting a concrete block. [R. 51, 57]. The year before the hearing, Plaintiff worked at One Home Medical Equipment on a full-time basis as a driver, and he was also required to assemble medical equipment. [R. 51, 58]. He only lifted and carried 20-25 pounds at that job and worked there until he had an accident. [R. 52]. Worker's compensation provided Plaintiff with a settlement, which he had to give to his mother and girlfriend. [R. 52].

In July 2019, Plaintiff had a slip and fall. [R. 53]. He is involved in ongoing legal proceedings. [R. 53]. Plaintiff had a prior lawsuit involving an automobile accident two or three years prior to the hearing. [R. 53–54]. He settled that case and received money. [R. 54]. Plaintiff traveled to Orlando in February 2018 for a funeral but has not traveled since. [R. 54].

Plaintiff cannot work because he has pain in his neck, back, and both sides of the "spine of the neck." [R. 58]. He also has headaches, his balance is off, and he is in a great deal of pain. [R. 58–59]. Plaintiff had bilateral foot surgery in the past and has hardware in both feet. [R. 59]. He has no range of motion and no balance and can barely stand up without assistance. [R. 59]. He cannot even get out of bed some days. [R. 59]. He tries to do little things to help his family. [R. 59]. Plaintiff has pain in both feet, but the pain in his right foot is worse. [R. 59]. The pain is sharp, and his feet are sometimes numb and also swell after he stands up for 5 to 10 minutes. [R. 59]. Plaintiff has sharp, radiating pain to his lower back and left leg. [R. 60]. His left leg is numb, tingling, and swollen every day. [R. 60]. Plaintiff also has pain every day on both sides of his neck up to his head. [R. 60]. He has pain in his arms, and sometimes he loses a little bit of grip in his hands when trying to grasp things. [R. 60].

Plaintiff can only walk 5 to 10 minutes before stopping and can only stand for 5 to 10 minutes. [R. 61]. He can sit for about 10 minutes before he has to get up and switch positions and stretch his back. [R. 61]. Plaintiff can only lift about 5 to 10 pounds. [R. 61]. He has difficulty bending over and gets numb and loses his balance. [R. 61]. Plaintiff does not even try to climb stairs or ramps anymore because, with his lower back issues, ankles, and balance, he cannot do it. [R. 62]. He has difficulty reaching his arms over his head and to the side without radiating pain in his neck. [R. 62]. Plaintiff has headaches every other day for the entire day. [R. 62]. Sometimes he

becomes nauseous. [R. 62]. In order to relieve headache pain, Plaintiff takes hot showers and uses ice packs and medication. [R. 62]. Sometimes he will go to the hospital if the pain is too much. [R. 62].

Plaintiff does not do any chores around the house. [R. 63]. His girlfriend does the grocery shopping. [R. 63]. Plaintiff has no social activities outside the house. [R. 63]. During the day, he is usually in his recliner for part of the day or in bed. [R. 63]. The recliner takes pressure off his lower back and neck and allows him to elevate his feet to decrease the swelling. [R. 63]. Plaintiff's feet swell every day or every other day depending on how much he stands. [R. 63–64]. He has had injection therapy for his neck and back. [R. 64]. The shots did not help at all. [R. 64]. Surgery has been recommended for his lumbar spine or neck, but he cannot afford the surgery. [R. 64]. Plaintiff has trouble maintaining attention and concentration due to his pain and balance issues. [R. 64].

The vocational expert ("VE"), Mia Heikkila, testified next. She classified Plaintiff's past work first. [R. 66–67]. The ALJ posed a hypothetical in which an individual of the same age, education, and work experience was Plaintiff was able to perform the full range of light work with the following additional limitations: he could sit for 6 hours in an 8-hour day; could stand and walk for 5 hours in an 8-hour day; could occasionally push and pull with the bilateral upper extremities; could occasionally climb ramps and stairs; could never climb ladders, ropes and scaffolds; could never balance; could occasionally stoop, kneel, crouch and crawl; could occasionally reach overhead with the bilateral upper extremities; could frequently use foot controls; and could not be exposed to vibration or hazards such as unprotected heights. [R. 67]. The VE testified that such an individual could perform none of Plaintiff's past jobs. [R. 68]. However, she testified that such an individual could work as a cashier II, which is classified as light work with an SVP level of 2. [R.

69]. The VE then reduced the number of jobs available by 75% to give a "conservative estimate of number of jobs available with that standing and walking limitation to five. And that number—the reduced number is approximately 319,000." [R. 69]. The ALJ questioned if 319,000 included that reduction, and the VE replied that it did. [R. 69].

The VE also testified that the hypothetical individual could work as a shipping and receiving weigher, which is classified as light work with an SVP level of 2. [R. 69]. The VE stated "a 75 percent reduction; that number would be approximately 18,000 jobs in the United States." [R. 69]. Finally, she testified that the hypothetical individual could work as an office helper, which is classified as light work with an SVP level of 2. [R. 69]. The VE explained, "[a]nd with the reduced numbers---and, again 75 percent reduction---there are approximately 53,400 jobs in the United States." [R. 69].

The ALJ asked the VE if her testimony was consistent with the DOT. [R. 69]. She responded that it was "with the exception—with the standing and walking limitation to total of five hours and also[,] DOT's companion publication, SCO, does not differentiate among reaching directions. And in regards to these limitations, I base my opinion on my education, training, and experience." [R. 69]. The ALJ also confirmed with the VE that the reduction in job numbers was "to comport with the variance with the DOT as far as standing and walking." [R. 70].

Plaintiff's counsel posed a hypothetical to the VE in which an individual the same age and education as Plaintiff was limited to sitting for only 2 hours at one time without interruption for a total of 6 hours in an 8-hour day; standing for a maximum of one hour at a time to a maximum of 3 hours out of an 8-hour day; walking for one hour out of an 8-hour day, with a maximum of 2 hours per day; requiring the ability to change position as needed; occasional reaching overhead;

6

occasional pushing and pulling, climbing stairs, stooping, kneeling, crouching, and crawling; never balancing or climbing ladders or scaffolds; never being exposed to unprotected heights, humidity, wetness, dust, odors, extreme cold or heat, or vibration; and requiring a moderate noise level. [R. 70–71]. The VE responded that the hypothetical was "work preclusive." [R. 71].

Plaintiff's counsel posed a second hypothetical in which the individual could only sit for 6 hours out of an 8-hour day, could sit or stand at will, and was limited to only occasional reaching with the right arm and occasional pushing and pulling with bilateral hands. [R. 71]. The VE responded that the hypothetical was "work preclusive, and it is due to the sit and stand option at will." [R. 72]. The VE also testified that, for an unskilled worker, employers "usually tolerate up to 10 percent off-task behavior. And anything beyond that is work preclusive." [R. 72]. Similarly, unskilled workers can only be absent once per month, and more absences than that preclude work. [R. 73]. Plaintiff's counsel asked the VE if she had taken into consideration any new unemployment numbers due to COVID-19, and she said that she had not and that those numbers were not available yet. [R. 73]. The VE also did not want to speculate on the numbers because "it may be cyclical. We don't know when it will go back." [R. 74]. Plaintiff's counsel asked the VE whether, if the limitation were overhead reaching in all directions rather than just overhead reaching, the cashier II, shipping and receiving weigher, and office workers jobs would be eliminated. [R. 74–75]. The VE responded that they would. [R. 74–75].

### B. **Medical Record Evidence**

In reaching her decision to deny Plaintiff's benefits in the case at hand, the ALJ reviewed the medical evidence of record. Only the medical evidence of record which is relevant to the issues on appeal is summarized chronologically below.

Plaintiff was involved in a motor vehicle crash on March 21, 2010. [R. 407]. Then he was involved in a second motor vehicle crash on August 26, 2010, when he was 19 years old. [R. 407]. Plaintiff had MRIs completed for his neck and low back pain and extremity radiculopathy in 2010. [R. 403–406]. He presented to Gregg F. Moses, D.C., on September 17, 2010, for an examination. [R. 407]. In light of the MRI results, Plaintiff was diagnosed with post-traumatic cephalgia; acute cervical acceleration/deceleration syndrome with spasm and radiculitis, resulting in articular facet dysfunction; suspect cervical radiculopathy; acute left shoulder strain/rule out supraspinatus tear vs. impingement syndrome; acute thoracic sprain/strain with spasm; acute lumbosacral sprain/strain with spasm and radiculitis; and suspect lumbar radiculopathy. [R. 411]. Plaintiff went back for regular physical therapy treatment from April 2010 through December 2010. [R. 413–432].

Plaintiff presented to Dr. Gary Gallo, a board-certified orthopedic surgeon on August 18, 2011, complaining of neck pain and lower back pain radiating to the right leg. [R. 449]. After a physical examination, Dr. Gallo found that Plaintiff had mild palpable tenderness over the cervical extensors and the spinous processes; mildly limited range of motion related to the cervical spine; no muscle atrophy; mild percussive tenderness over the lower back region; and somewhat limited range of motion related to the lumbar spine. [R. 451]. Dr. Gallo also reviewed Plaintiff's MRIs and x-rays from 2011. [R. 452]. He diagnosed Plaintiff with cervical sprain/strain, cervical disc herniation at C4/5 with a radial tear, lumbosacral sprain/strain, and lumbar disc herniation at L5/S1. [R. 452]. Dr. Gallo found that surgery may be required at a later time. [R. 452].

After Plaintiff got into another motor vehicle accident on October 10, 2014, he had an MRI performed. [R. 454]. It showed loss of the normal lordotic curvature of the lumbar spine (and

clinical correlation was recommended); a disc bulge at L4-L5 with an anterior impression on the thecal sac; and a right paramedian disc herniation at L5-S1 which abuts the thecal sac and also involved disc bulge. [R. 454–455].

On October 21, 2014, Plaintiff presented to Michael M. Rudoni, D.C., as a direct result of injuries, specifically his lower, middle, and upper back pain, as well as neck and shoulder pain, sustained in his October 10, 2014 car accident. [R. 484]. After a physical examination and radiographic evaluation, Dr. Rudoni diagnosed Plaintiff with acute, severe lumbosacral injury associated with edematous infiltration of paralumbar musculature aggravated by bending postures, concomitant with spinous process rotations. [R. 486]. He determined Plaintiff's prognosis to be poor. [R. 486].

Plaintiff followed up with chiropractic treatment and physical therapy on many occasions from A & M Chiropractic, LLC, and Dr. Khalil Moses. [R. 474–505, 509–510, 530–535, 538, 542–543].

On June 29, 2015, Plaintiff saw Dr. Alexander N. Lenard. [R. 518]. Plaintiff reported that physical therapy had not resulted in any improvement, and that he was not taking any medications for the pain. [R. 518]. Upon physical examination of Plaintiff, Dr. Lenard noted that the cervical spine showed tenderness on palpation of the trapezius muscle and stiff neck; the lumbosacral spine exhibited tenderness on palpation; and there was tenderness on palpation of the buttocks on the right side. [R. 519]. Dr. Lenard also reviewed Plaintiff's x-rays and MRI. [R. 519]. He assessed neck and low back pain and recommended physical therapy. [R. 520].

On July 28, 2015, Plaintiff presented to Khalil Vadre Moses, D.C., for a final examination based on the injuries he sustained as the result of the October 10, 2014 car accident. [R. 539].

Plaintiff reported that, since he began treatment at that office, he had noticed much improvement with regard to the pains he had been experiencing in his cervical, thoracic, and lumbar spine regions, as well as in his shoulder. [R. 539]. Dr. Moses noted that Plaintiff's cervical ranges of motion were reduced with pain, and his dorso-lumbar ranges of motions were reduced with stiffness. [R. 539]. He also noted that Plaintiff had myospasms throughout the posterior cervical musculature from the levels of C2 through C6, throughout the paraspinal musculature at the thoracic levels of T3 through T9, and throughout the erector spinae musculature from the lumbar levels of L2 through L5. [R. 540]. A shoulder depression test proved to be positive, bilaterally for cervical pain; a cervical fixation test proved to be positive for neck pain; and a Soto Hall test provide to be positive for cervical pain. [R. 540]. Dr. Moses opined that joint mobilization, electrical muscle stimulation, cryo/moist heat therapy, therapeutic exercises, and manual therapy had been helping Plaintiff, but the treatments were never completed. [R. 540]. Dr. Moses found that there was no reason to expect any change in Plaintiff's "medical pictures in the immediate future" and that Plaintiff had been advised to refrain from strenuous activities involving the affected area. [R. 541]. Dr. Moses determined that Plaintiff had sustained a 10-12% permanent impairment of his whole body. [R. 541].

On September 16, 2015, Plaintiff had an MRI of the cervical spine performed. [R. 525]. It was determined that he had a bulging disc at the C3/4 level, small disc herniations with annular tears at the C4/5 and C5/6 levels, a herniated disc at the C6/7 level, and straightened alignment suggesting muscle spasm. [R. 526].

It appears that Plaintiff was involved in another motor vehicle accident on December 8, 2015. [R. 783]. On February 2, 2016, Plaintiff had MRIs of the cervical spine and lumbar spine

performed. [R. 569–571]. The MRI of the cervical spine showed C3-4 central disc herniation which impinges upon the cervical cord, narrowing of the central canal (worsened from 9/16/15), and an associated annular tear that was increased in prominence from the prior exam; C4-5 and C5-6 central disc herniations which impinge upon the anterior thecal sac, narrowing the anterior subarachnoid space at both levels (unchanged from 9/15/16), and associated annular tears at both levels; and straightening of the normal cervical lordotic curve, unchanged and possibly secondary to muscle spasm. [R. 569]. The MRI of the lumbar spine showed L5-S1 central disc herniation which impinges upon the anterior epidural spaces, resulting in mild bilateral neural foraminal stenosis (worsened to the left from 9/15/10). [R. 570].

Plaintiff saw Dr. Jane Bistline at Central Palm Beach Surgery Center for cervical epidural steroid injections, a cervical epidurogram, and medial branch nerve block injections on February 8, 2016 [R. 800]. After the procedures, he reported a 60% improvement for a few hours, but then the pain returned. [R. 783]. Plaintiff again received medial branch nerve block injections on April 6, 2016 [R. 777].

In a Disability Determination Explanation at the Initial Level, dated September 20, 2017, Christopher L. Archie, SDM, found that a consultative examination was not necessary and considered the record evidence. [R. 90–98]. He determined that Plaintiff suffered from severe impairments of dysfunction of major joints and spine disorders and a non-severe disorder of chronic liver disease. [R. 94]. Mr. Archie found Plaintiff's statements about the intensity, persistence, and functionally limiting effects of the symptoms to be substantiated by the objective medical evidence alone. [R. 95]. He determined the following RFC for Plaintiff: Plaintiff can occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds; can stand

and/or walk for a total of about 6 hours in an 8-hour workday; can sit about 6 hours in an 8-hour workday; can push and/or pull an unlimited amount; can occasionally climb ramps/stairs, climb ladders/ropes/scaffolds, and stoop; and can frequently balance, kneel, crouch, and crawl; and has no other limitations. [R. 95–96]. Mr. Archie determined that Plaintiff could only perform light work, listed occupations that were appropriate for Plaintiff, and determined Plaintiff to not be disabled. [R. 97–98].

On January 1, 2018, Plaintiff presented to Dr. Daniel Nader Daria with chronic right hip pain. [R. 558]. After he conducted a physical exam, Dr. Daria noted that Plaintiff had no evidence of swelling at the joints, no evidence of trigger points, and grip strength of 5/5 on both sides. [R. 561]. He also noted no abnormalities of the extremities, that Plaintiff has a normal gait, that Plaintiff can squat and rise from the chair using the table as support, and that Plaintiff's straight leg raising supine and sitting are within normal range. [R. 561].

In a Disability Determination Explanation at the Reconsideration Level, dated January 10, 2018, it was determined that a consultative examination was required. [R. 107]. Linda Burke Galloway, M.D., M.S., reviewed the record evidence and conducted the examination. [R. 109]. She determined that Plaintiff's allegations were inconsistent with the objective evidence, that the totality of objective evidence did not establish the severity of Plaintiff's physical impairments, and that she was assessing the claim as non-severe. [R. 109]. Dr. Galloway determined that Plaintiff suffered from non-severe impairments of dysfunction of major joints, spine disorders, chronic liver disease, and substance addiction disorders (drugs). [R. 110]. Shane Hobstetter then determined that Plaintiff was not disabled. [R. 110–111].

On March 16, 2018, Plaintiff had an MRI of the cervical spine. [R. 573]. It showed a 1 mm

disc herniation with annular fissure at C4/5 and C5/6 levels, disc bulge at C3/4 and C6/7 levels, and straightened alignment suggesting muscle spasm. [R. 574].

Plaintiff saw Dr. Robert Deluca and visited Pain Center of Palm Beach from September 2016 through August 2018 [R. 576–715]. He was prescribed Oxycodone, Flexeril, Ibuprofen 800 mg, Xanax, Narcan spray, Adderall, and other medications. [R. 577–715]. Plaintiff often reported that participation in clinic was making his goal of maintaining pain while working "much better," especially during the later visits. [R. 579, 588, 596]. Additionally, the clinic noted that therapy was decreasing his pain level during these later visits. [R. 584, 593, 601].

Plaintiff presented to Dr. Karen Driscoll on November 21, 2018, complaining of neck pain and low back pain. [R. 738]. She decreased his Oxycodone. [R. 740]. Plaintiff presented to Dr. Driscoll on January 16, 2019, again complaining of neck pain and low back pain. [R. 726]. She decreased his Oxycodone and noted that Plaintiff reported some improvement in his pain with his current opioid medication regimen. [R. 734]. Plaintiff saw Dr. Driscoll on February 13, 2019, again complaining of neck pain and low back pain. [R. 726]. Upon examining Plaintiff, Dr. Driscoll noted moderate pain with motion in the cervical spine, moderate pain with motion in the lumbar spine, and moderate pain with motion in the right foot. [R. 728]. Dr. Driscoll also noted that Plaintiff reported some relief from his chronic pain syndrome with his current opioid medication regime. [R. 728]. Plaintiff reported improved activity and functional levels on the medication regime. [R. 728]. Finally, Dr. Driscoll wrote that Plaintiff's neck, back, and foot pain are worse with cold weather. [R. 728]. She re-filled his Oxycodone and determined that she should not decrease the dosage at that time. [R. 729].

On March 6, 2019, Dr. Driscoll completed a Physical Medical Source Statement. [R. 717–

720]. She noted that she had been seeing Plaintiff since 2009 and listed Plaintiff's prognosis as chronic pain in his neck, back, and foot. [R. 717]. Dr. Driscoll checked the boxes for the following limitations she ascribed to Plaintiff: he can sit for 5-10 minutes at a time; can stand for 5-10 minutes at a time; can sit and can stand/walk for 2 hours in a 8-hour workday with normal breaks; must walk every 5 minutes for 5 minutes; needs unscheduled breaks every 10-15 minutes; can rarely lift and carry up to 20 pounds; can rarely twist and stoop; can never crouch/squat or climb stairs or ladders; can only use his fingers and arms for grasping, fine manipulations, reaching in front of his body, and reaching overhead for 15% of the workday; would be off task 25% or more of the workday; would be absent from work more than 4 days per month; and needs to avoid extreme temperatures and humidity. [R. 717–720]. She repeatedly noted that Plaintiff is unable to work. [R. 719]. According to Dr. Driscoll, Plaintiff suffers from intractable pain every day. [R. 720].

On May 2, 2019, Plaintiff went to Wellington Regional Medical Center after he fell off a truck while working and landed on his right side, hitting his head, arm, and lower back. [R. 767]. An exam showed normal range of movement, normal strength, no tenderness, and negative straight leg raise. [R. 769]. Plaintiff had a CT of his cervical spine performed. [R. 745]. He was found to have reversal of the normal cervical lordotic curvatures, which may indicate evidence of muscle spasm; a 1 mm posterior central disc herniation at C3-4; and bulging of the disc and effacement of the ventral thecal sac at C4-5, C5-6, and C6-7. [R. 745]. An x-ray of Plaintiff's lumbosacral spine showed no significant bony abnormality. [R. 775].

On August 14, 2019, Plaintiff presented to Dr. Jane E. Bistline after he was involved in a slip and fall accident on July 23, 2019, with resulting neck, bilateral ankle, and low back pain. [R. 747]. Upon examining Plaintiff, Dr. Bistline noted tenderness with mild-moderate muscle spasms

14

in the cervical spine; decreased range of motion in all fields and pain with extension and lateral rotation in the cervical spine; 5/5 grip strength in all areas; tender, moderate muscle spasms in the lumbar spine; a positive bilateral straight leg raising test; and a decreased range of motion in all fields and pain with extension and lateral rotation in the lumbar spine. [R. 748]. She also noted that the right ankle was tender and a range of movement elicited pain. [R. 749]. Dr. Bistline diagnosed Plaintiff with cervicalgia, low back pain, pain in unspecified ankle and joints of unspecified foot, and pain in unspecified joint. [R. 749]. She prescribed Baclofen. [R. 749].

Plaintiff's August 20, 2019 MRI of the cervical spine showed C3-4 disc herniation which impinges on upon the cervical cord, resulting in anterior central canal stenosis (worsened centrally and to the right from 2/2/16), as well as an associated annular tear; C4-5 and C5-6 central disc herniations which impinge on the thecal sac, narrowing the anterior subarachnoid space at both levels (unchanged from 2/2/16), as well as associated annular tears; and straightening of the normal cervical lordotic curved, unchanged and possibly secondary to muscle spasms. [R. 756]. Plaintiff's August 20, 2019 MRI of the lumbar spine showed L5-S1 central disc herniation which impinges on the anterior epidural space and bilateral L5 nerve roots, resulting in bilateral neural foraminal stenosis (worsened peripherally in comparison to 2/3/16). [R. 758].

Plaintiff saw Dr. Bistline again on August 27, 2019, and October 1, 2019. [R. 750, 753]. She recommended that Plaintiff receive a lumbar medial branch block. [R. 751–752, 755]. Plaintiff had the recommended procedures on August 27, 2019, September 10, 2019, October 1, 2019, and October 15, 2019. [R. 760–763].

From October 24, 2018, to December 11, 2019, Plaintiff went to Pain Relief Centers to treat his neck pain, low back pain, and chronic pain. [R. 831–908]. He was specifically diagnosed

with sacroiliitis, occipital neuralgia, cervical disc disorder with radiculopathy, opioid dependence, and anxiety. [R. 829–830]. His supervising physician was Dr. Anjan Ghosh. [R. 831]. Plaintiff reported that his medications allowed him to work full-time driving an armored car, but then he hurt his back jumping out of the truck at work. [R. 908]. Plaintiff was described as having back pain, joint pain, and musculoskeletal tenderness. [R. 911]. He was prescribed Alprazolam, Cyclobenzaprine, Ibuprofen 800 mg, Oxycodone, Narcan, and Xanax. [R. 913–827]. The patient notes state that Plaintiff was doing well on his pain medication regimen and that the medications were effective in decreasing pain level and improving function. [R. 832, 839, 845, 851, 858, 864, 871, 875 877, 883, 890, 892, 896, 989, 902]. The notes also stated that there were no side effects from the medications. [R. 902].

On January 28, 2020, Dr. Jacob Lochner completed a Social Security Disability Evaluation of Plaintiff. [R. 931]. Dr. Lochner noted that Plaintiff reported being in constant pain and also that Plaintiff had been in four motor vehicle accidents and had slipped and fallen once. [R. 931]. Plaintiff also reported that oral medications and epidural steroid injections had provided minimal relief. [R. 931]. At the time, Plaintiff was taking Oxycodone, Ibuprofen, and Trazodone. [R. 932]. Upon performing a physical exam, Dr. Lochner noted overall motor strength of the 4 to 4+/5 range; weakening in regard to bilateral extensor hallucis longus, but also ride sided dorsiflexion; deep tendon reflexes of ¼ in the upper and lower extremities; negative seated and supine straight leg raising; and a slightly slowed gait pattern with decreased stride length and cadence. [R. 933]. Plaintiff was able to do heel and toe as well as single leg standing, but with decreased overall balance. [R. 933]. Dr. Lochner diagnosed Plaintiff with cervical herniated nucleus pulposus, lumbar herniated nucleus pulposus, chronic pain syndrome, muscle spasm, and impaired balance.

[R. 933]. Dr. Lochner concluded that Plaintiff has underlying symptoms consistent with a chronic pain type syndrome and that Plaintiff remains at risk, with any job, of frequent tardiness and absenteeism. [R. 934]. Dr. Lochner opined that a sedentary job with the ability to change position as frequently needed would be the best "and potentially only option" for Plaintiff, and vocational reeducation or job retraining may be needed. [R. 934].

Dr. Lochner also completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical). [R. 938–943]. He determined that Plaintiff could frequently lift and carry up to 10 pounds and occasionally lift and carry up to 20 pounds; could sit for 2 hours at one time; could stand or walk for one hour at a time; could sit for 6 hours in an 8-hour workday; could stand for 3 hours in an 8-hour workday; could walk for 2 hours in an 8-hour workday; needs the ability to change positions as needed; could occasionally reach overhead with his right hand and could frequently reach overhead with his left hand; could frequently reach in all other directions, handle, finger, and pull with both hands; could occasionally push and pull with both hands; could frequently operate foot controls with both feet; could occasionally climb stairs and ramps; could never climb ladders or scaffolds or balance; could occasionally kneel, stoop, crouch and crawl; could never be exposed to unprotected heights, humidity and wetness, dust odors, fumes, and pulmonary irritants, extreme cold or heat, or vibrations; could occasionally be exposed to moving mechanical parts and occasionally operate a motor vehicle; and could only be exposed to moderate noise. [R. 938–942]. Dr. Lochner also opined that Plaintiff could perform every single one of the listed daily activities. [R. 943].

## C.  <u>ALJ's Decision</u>

The ALJ issued her decision on Plaintiff's claim for benefits on June 1, 2020. [R. 15–29].

The ALJ first found that Plaintiff engaged in substantial gainful activity during the period of April 2019 and that there had been a continuous 12-month period during which Plaintiff did not engage in substantial gainful activity. [R. 17]. The ALJ then found that Plaintiff suffered from the severe impairment of spine disorder (20 C.F.R. § 416.920(c)). [R. 17]. She found that Plaintiff's medically determinable impairments of chronic liver disease, substance abuse disorder, and status post removal of subtalar joint implant for revisional subtalar joint arthrodesis were not severe as defined by the Social Security Code. [R. 17–18]. The ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments of 20 C.R.F. Part 404, Subpart P, Appendix 1. [R. 19]. She specifically wrote,

> Under listing 1.02, the evidence does not demonstrate that the claimant has the degree of difficulty in performing fine and gross movements in both upper extremities as defined in 1.00B2c or the degree of difficulty in ambulating as defined in 1.00B2b. The medical evidence does not establish the requisite evidence of nerve root compression with associated findings on physical examination, spinal arachnoiditis, or lumbar spinal stenosis with inability to ambulate effectively as required under listing 1.04. The most recent exam in the file indicates that a straight leg raising test was negative in both the seated and supine positions; no sensory or reflex loss; or inability to ambulate effectively. (Ex. B26F)

[R. 19].

> The ALJ determined that Plaintiff has the RFC to
>
> perform light work as defined in 20 CFR 416.967(b) except the claimant can sit for 6 hours in an 8-hour day; can stand and walk for 5 hours in an 8-hour day; can occasionally push/pull with the bilateral upper extremities; can occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; never balance; occasionally stoop, kneel, crouch, and crawl; is limited to occasional overhead reaching with the bilateral upper extremities; frequent use of foot controls; and no exposure to vibration or hazards such as unprotected heights.

[R. 19]. The ALJ considered Plaintiff's medical records and testimony and found that Plaintiff's

18

"medically determinable impairment could have been reasonably expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." [R. 19]. The ALJ specifically discussed the record evidence and explained that evidence dating prior to December 18, 2013 was of minimal relevance. [R. 19]. She further noted that the record "lacks objective exam findings of any physical or mental limitations during the relevant period." [R. 19–20].

With regard to Plaintiff's spine disorder, the ALJ explained that Plaintiff "does have some significant objective findings on cervical and lumbar MRI scans which support functional limitations" and then described the diagnostic images and MRIs. [R. 21]. However, she further explained that "[t]he level and effectiveness of treatment does not support greater limitations than found in his residual functional capacity. Treatment has been conservative overall, but still generally effective." [R. 21]. Then she delved into all of Plaintiff's treatment. [R. 21]. The ALJ determined that Plaintiff "has had significant effectiveness with treatment modalities. By January, March, and May 2017, just prior to the application date, the claimant noted that his pain was decreased." [R. 21]. The ALJ carefully went through each of the relevant medical records in her decision. [R. 22–26]. She concluded that the "objective findings on clinical exams of record do not support limitations greater than found in his residual functional capacity," and "[t]he objective clinical exam findings with these specialist pain management providers are consistent with exertional, postural, reaching, and environmental functional limitations, but are overall not strongly adverse, particularly with respect to neurological findings and gait." [R. 23]. The ALJ noted "some significant activities of daily living in spite of his pain symptoms." [R. 24].

The ALJ considered the records from Dr. Ghosh and Palm Beach Pain Center and found their opinion that Plaintiff should not use heavy machinery while using opioids and avoid heavy lifting and high impact activity to be vague, but also "generally persuasive" and consistent with the RFC and other medical records. [R. 24–25]. The ALJ found the January 2018 opinion of State agency medical consultant Dr. Galloway that Plaintiff had no severe impairments to not be persuasive and to not be well supported. [R. 25]. She found the January 2020 opinion of consultative examiner Dr. Lochner to be "partially persuasive." [R. 25]. The ALJ found the opinion of Dr. Driscoll to not be persuasive and a "gross overstatement of the claimant's limitations." [R. 26]. Finally, she determined that the January 2018 opinion of consultative examiner Dr. Daria that Plaintiff had the ability to manage his own finances to be persuasive. [R. 26].

The ALJ found that Plaintiff was unable to perform any past relevant work; that he was 26 years old and a younger individual on the date the application was filed; that he has at least a high school education and is able to communicate in English; and that transferability of job skills is not material to the determination of disability "because using the Medical-Vocations Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job skills." [R. 27]. The ALJ concluded that, considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. [R. 27]. The ALJ found that, based on the vocational expert's testimony, Plaintiff is able to perform the following jobs (which are all unskilled and all involve a light exertional level): cashier II (319,000 jobs nationally), shipping and receiving weigher (18,000 jobs nationally), and office helper (53,400 jobs nationally). [R. 28]. The ALJ explained that the VE's testimony

is consistent with the information contained in the Dictionary of Occupational Titles except for the testimony regarding 5 hours standing and walking, which the vocational expert testified would reduce the job numbers by 75%, and which she considered in the job numbers she provided. The Dictionary of Occupational Titles also does not address directional reaching. The vocational expert further testified that her opinion regarding light jobs with standing and walking limited to 5 hours out of an 8 hour day and directional reaching are based on her education, training, and experience. Such experience includes observing these jobs, placing individuals in these jobs, and analyzing these jobs.

[R. 28]. Based on the above, the ALJ found Plaintiff to be not disabled. [R. 28].

### III. <u>MOTIONS FOR SUMMARY JUDGMENT</u>

In her Motion for Summary Judgment, Plaintiff makes four arguments. [DE 27]. First, he argues that the appointment of Andrew Saul as single commissioner of the Social Security Administration violated the Separation of Powers Clause, so the administration decision in this case is constitutionally defective. Second, he contends that the vocational expert's testimony does not constitute substantial evidence upon which the ALJ could properly rely. Third, Plaintiff asserts that the ALJ failed to properly evaluate Plaintiff's spinal impairment pursuant to the requirements set forth under Listing 1.04(A). Finally, he argues that the ALJ's RFC finding it is not supported by substantial evidence.

In Defendant's Motion for Summary Judgment with Supporting Memorandum of Law and Response to Plaintiff's Motion for Summary Judgment, Defendant asserts Plaintiff's separation of powers argument does not entitle him to a rehearing of his disability claim, that Plaintiff failed to meet his burden at Step Five to demonstrate that he could not perform other work existing in significant numbers in the national economy and also failed to meet his burden to prove that he met or equaled Listing 1.04A, and that substantial evidence supported the RFC finding. [R. 30].

The parties' arguments are discussed in more detail below.

## IV. RELEVANT LAW

Judicial review of the factual findings in disability cases is limited to determining whether the Commissioner's decision is "supported by substantial evidence and based on proper legal standards. Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." 42 U.S.C. § 405(g); *Crawford v. Comm'r of Soc. Sec.*, 363 F. 3d 1155, 1158 (11th Cir. 2004) (per curiam) (internal citation omitted) (quoting *Lewis v. Callahan*, 125 F. 3d 1436, 1439 (11th Cir. 1997)). Courts may not "decide the facts anew, reweigh the evidence, or substitute [their] judgment for that of the [Commissioner]." *Phillips v. Barnhart*, 357 F. 3d 1232, 1240, n. 8 (11th Cir. 2004) (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

The restrictive standard of review set out above applies only to findings of fact. No presumption of validity attaches to the Commissioner's conclusions of law. *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "The [Commissioner's] failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining the proper legal analysis has been conducted mandates reversal." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F. 3d 1253, 1260 (11th Cir. 2007) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991)).

Social Security regulations establish a five-step sequential analysis to arrive at a final determination of disability. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920 (a)-(f). The ALJ must, first, determine whether the claimant is presently employed. If so, a finding of non-disability is made, and the inquiry concludes. 20 C.F.R. § 404.1520(b). In the second step, the ALJ must determine

whether the claimant suffers from a severe impairment or combination of impairments. If the ALJ finds that claimant does not suffer from a severe impairment or combination of impairments, a finding of non-disability results, and the inquiry ends. 20 C.F.R. § 404.1520(c).

Step three requires the ALJ to compare the claimant's severe impairment(s) to those in the listing of impairments. 20 C.F.R. § 404.1520(d), subpart P, appendix I. Certain impairments are so severe, whether considered alone or in conjunction with other impairments, that, if they are established, the regulations require a finding of disability without further inquiry into the claimant's ability to perform other work. *See Gibson v. Heckler*, 762 F.2d 1516, 1518, n. 1 (11th Cir. 1985). If the impairment meets or equals a listed impairment, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d).

Step four involves a determination of whether the claimant's impairments prevent him or her from performing his or her past relevant work. If the claimant cannot perform his or her past relevant work, then a *prima facie* case of disability is established. 20 C.F.R. § 404.1520(e). The burden then shifts to the ALJ to show at step five that, despite the claimant's impairments, he or she is able to perform work in the national economy in light of the claimant's RFC, age, education, and work experience. 20 C.F.R. § 404.1520(f); *Phillips*, 357 F. 3d at 1239. To determine whether the claimant has the ability to adjust to other work in the national economy, the ALJ may either apply the Medical Vocational Guidelines, 20 C.F.R. pt. 404 subpt. P, app.2, or utilize the assistance of a vocational expert. *See Phillips*, 357 F. 3d at 1239-40.

## V. <u>ANALYSIS</u>

A. <u>Whether Plaintiff's Separation of Powers Argument Entitles Him to a Rehearing of His Disability Claim</u>

Plaintiff argues that the United States Supreme Court "has held that it is unconstitutional

23

for an executive agency to be led by a single head who serves for a longer term than the President and can only be removed from his position for cause. *Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (Jun. 20, 2020)." [DE 27 at 4]. Plaintiff relies on this case law to argue that the Social Security Administration's structure is "unconstitutional as it violates separation of powers." *Id.* Plaintiff next contends that he was deprived of a valid administrative adjudicatory process in this case and a "presumptively inaccurate legal standard was utilized to adjudicate this disability claim at the administrative level." *Id.* at 5. Plaintiff calls on "DOJ" to "explain its change of position to the Court. In other words, DOJ must articulate why it previously viewed SSA's single Commissioner for cause removal structure as constitutional in 1994 and in the firing of Saul but does not hold that view now despite the absence of any intervening corrective amendments." *Id.* Plaintiff requests a de novo hearing before a new ALJ "who does not suffer from the unconstitutional taint of having previously heard and decided this case when the ALJ had no lawful authority to do so." *Id.* at 6.

In response, Defendant agrees that 42 U.S.C. § 902(a)(3) violates the separation of powers doctrine. [DE 30 at 4]. However, she argues that this is not enough to set aside Plaintiff's disability benefits determination. Defendant cites *Collins v. Yellen*, 141 S. Ct. 1761, 1787-89 (2021), for the premise that "even where an unconstitutional statutory removal restriction exists, a plaintiff seeking relief on that basis must show that the restriction actually caused him harm." *Id.* Defendant points out that the ALJ who issued the decision in Plaintiff's case "was not appointed by a Commissioner subject to 42 U.S.C. § 902(a)(3)'s removal restriction. Rather, the ALJ had her appointment ratified by an Acting Commissioner of Social Security . . . . As a factual matter, there is therefore no separation of powers concern in Plaintiff's case." *Id.* Next, Defendant asserts that

Plaintiff has not, and cannot, show that the removal restriction actually caused the denial of his disability benefits claim. *Id.* Defendant further argues that Plaintiff's rehearing request should be denied under the Harmless Error Doctrine, the *De Facto* Officer Doctrine, the Rule of Necessity, and broad prudential considerations. *Id.* at 11–16.

In the context of the Federal Housing Finance Agency, the Supreme Court recently observed that the unlawfulness of a removal provision "[did] not strip the Director of the power to undertake the other responsibilities of his office." *Collins v. Yellen*, 141 S. Ct. 1761, 1788 n.23 (2021). In her concurrence, Justice Elana Kagan specifically discussed the implications of *Collins* on the Social Security Administration. *Id.* at 1799-02 (Kagan, J., concurring). Justice Kagan theorized:

> Given the majority's remedial analysis, I doubt the mass of SSA decisions—which would not concern the President at all—would need to be undone. That makes sense. Presidential control does not show itself in all, or even all important, regulation. When an agency decision would not capture a President's attention, his removal authority could not make a difference—and so no injunction should issue.

*Id.* at 1802 (internal citations and quotations omitted). Furthermore, "[m]ultiple courts reviewing denials of applications for Social Security Benefits in the wake of *Seila Law* and *Collins* have similarly concluded plaintiffs must establish the removal provision of 42 U.S.C. § 902(a)(3) caused some compensable harm to warrant remand." *Rickles v. Kijakazi*, No. 8:20-CV-2988-AAS, 2022 WL 1153803, at *5–6 (M.D. Fla. Apr. 19, 2022) (finding that the claimant had not established that the ALJ's review of her Social Security claim for benefits suffered from any "unconstitutional taint" because the claimant failed to argue that she suffered any form of compensable harm stemming from the removal provision of 42 U.S.C. § 902(a)(3)); *Smith v. Kijakazi*, No. 7:21-CV-00059-AKK, 2022 WL 1063640, at *9 (N.D. Ala. Apr. 8, 2022) (rejecting the claimant's argument

that Commissioner Saul's extended tenure affected her disability determination because it was conclusory.).

In a recent Southern District of Florida decision, *Alicea v. Kijakazi*, No. 21-60760-CIV, 2022 WL 902858, at *9 (S.D. Fla. Mar. 11, 2022), *report and recommendation adopted sub nom. Alicea v. Saul*, No. 21-60760, 2022 WL 898563 (S.D. Fla. Mar. 28, 2022), the court first, relying on *Standifird v. Kijakazi*, No. 20-cv-1630-GPC (BLM), 2021 WL 5634177, at *4 (S.D. Cal. Dec. 1, 2021), and *Perez Kocher v. Comm'r of Soc. Sec.*, 6:20-cv-2357-GKS-EJK, 2021 WL 6334838, at *5-6 (M.D. Fla. Nov. 23, 2021), found that no relief to a claimant under the separation of powers argument is warranted when the ALJ who rendered the unfavorable decision in question had been re-appointed by Acting Commissioner Nancy Berryhill. The court next explained that other courts have denied relief when a plaintiff could not demonstrate any harm caused to them by the removal provision. *Id.* at * 9 (citing Carolyn M.D. v. Kijakazi, No. 2:20-cv-06725-AFM, 2021 WL 6135322, at *12 (C.D. Cal. Dec. 28, 2021); *Rhonda Lynn Tibbetts v. Comm'r of Soc. Sec.*, No. 2:20-cv-872-SPC-MRM, 2021 WL 6297530, at *6 (M.D. Fla. Dec. 21, 2021); *Michele T. v. Comm'r of Soc. Sec.*, No. 3:20-cv-06085-JRC, 2021 WL 5356721, at *5-6 (W.D. Washington, Nov. 17, 2021)). The court concluded that the "harm identified by the Plaintiff in the instant case is the fact that he received unfavorable decisions from an ALJ and Appeals Council pursuant to delegation of duties to those officers by Commissioner Saul, who was operating under an unconstitutional removal clause. Clearly this is not sufficient, as it would apply to virtually every disability case since the enactment of § 902(a)(3) and would render meaningless Collins' requirement of direct harm." *Id.* at * 10. The court also pointed out that the plaintiff had "failed to demonstrate that the removal provision had any actual or possible impact on the unfavorable

decision he received, and no relief is warranted on this ground." *Id.* The court ruled that the decision of the ALJ should not be disturbed. *Id.*

In the case at hand, and in light of the above case law, Plaintiff's argument has no merit. First, the ALJ who rendered the unfavorable decision in question had been re-appointed by the Acting Commissioner. Second, Plaintiff has provided no evidence or argument whatsoever about a compensable harm against him, other than the fact that his claim was denied, stemming from the removal provision of 42 U.S.C. § 902(a)(3)). Plaintiff's conclusory argument that he is entitled to remand must be rejected.

B. Whether the Vocational Expert's Testimony Constitutes Substantial Evidence upon Which the ALJ Could Properly Rely

Plaintiff argues that the "job incidence data provided by the VE for all three jobs is substantially overstated, the VE failed to properly identify the source or sources upon which [s]he relied in testifying about jobs numbers, and the VE failed to describe the methodology she employed in calculating the jobs incidence data." [DE 27 at 7]. Plaintiff has attached to his Motion for Summary Judgment descriptions and numbers from the SkillTran's Job Browser Pro. [DE 27-1]. He contends that the numbers of jobs in the national economy in SkillTran's Browser Pro, substantially differ from the numbers of jobs stated by the VE during the hearing. [DE 27 at 7]. Plaintiff also argues that the "discrepancies in the VE's testimony cannot be construed as simply amounting to harmless error." *Id.* at 8. According to Plaintiff, the VE's numbers are an overestimation based on a pro rata method of the numbers of jobs published by the Department of Labor per SOC code. *Id.* Plaintiff also argues that the pandemic-related unemployment factors should have been taken into account. *Id.* at 9. In sum, Plaintiff maintains that the "VE's testimony is insufficient for the Commissioner to sustain his burden of proof at step five." *Id.* at 12.

Defendant responds that the Court should not consider the SkillTran Job Browser Pro data referenced by Plaintiff because he "did not present the data at the hearing and did not object to the vocational expert's testimony at that time." [DE 30 at 17]. Defendant also argues that "nothing in the record indicates that the vocational expert provided job numbers for an entire category of occupations (i.e., SOC codes) that included the relevant DOT titles, instead of job numbers for each DOT title." *Id.* at 17–18.

This Court is permitted to consider "only to the evidence actually presented to the ALJ." *Falge v. Apfel*, 150 F.3d 1320, 1323 (11th Cir. 1998); *see also Cherry v. Heckler*, 760 F.2d 1186, 1193 (11th Cir. 1985). At the hearing in this case, the only evidence presented to the ALJ concerning the number of certain jobs available in the national economy was the vocational expert's testimony. Plaintiff did not present occupational employment statistics before the ALJ or object to the vocational expert's testimony, other than to ask if she had taken into consideration any new unemployment numbers due to COVID-19. Furthermore, Plaintiff's counsel stipulated that the vocational expert was qualified to testify. [R. 65]. As a result, this Court is "foreclosed from considering the data in the occupational employment statistics on appeal." *Valdez v. Comm'r of Soc. Sec.*, 808 F. App'x 1005, 1009–10 (11th Cir. 2020). This Court is not permitted to consider this issue or Exhibit 1 to Plaintiff's Motion for Summary Judgment on appeal. The Court also notes that Plaintiff did not choose to respond to Defendant's Motion for Summary Judgment and thus failed to respond to the waiver argument.

Even if Plaintiff had not effectively waived his argument by failing to object at the hearing, in *Biestek v. Berryhill*, 139 S. Ct. 1148 (2019), the Supreme Court determined that a vocational expert's refusal to provide private market-survey data upon the claimant's request did not

28

categorically preclude the VE's testimony from counting as "substantial evidence." *Id.* at 1152. The Supreme Court observed that "expert testimony can sometimes surmount" the substantial evidence bar "absent underlying data." *Id.* at 1152, 1156. So, "a refusal to a request for" data that a VE relies upon should not make a VE's testimony "categorically inadequate." *Id.* at 1156. This law contradicts Plaintiff's argument that this case should automatically be remanded because the VE failed to identify the source or sources upon which she relied in testifying about jobs numbers, and that the VE failed to describe the methodology she employed in calculating the jobs incidence data.

A Middle District of Florida court in *Geisler v. Saul*, No. 5:18-CV-400-OC-JRK, 2020 WL 1243246, at *4 (M.D. Fla. Mar. 16, 2020), recently affirmed the decision of the ALJ even when the record contained no evidence of the reliability of SkillTran, the VE's level of reliance on it, or whether the VE relied upon any other sources for the job numbers. The court noted that the VE also relied on his "knowledge, experience, and training" for his opinion. *Id.* The VE in the case at hand also based her opinion on her education, training, and experience. [R. 69]. In light of this body of law, Plaintiff's argument that remand is warranted is without merit.

Furthermore, the Court has carefully reviewed the two primary cases relied upon by Plaintiff, *Goode v. Commissioner of Social Security*, 966 F.3d 1277 (11th Cir. 2020), and *Viverette v. Commissioner of Social Security*, 13 F.4th 1309 (11th Cir. 2021). In *Goode*, the claimant's attorney questioned the VE's methodology during the hearing, and the VE further explained the methodology. *Goode*, 966 F.3d at 1279. That did not occur in the case at hand. In *Viverette*, the VE testified that there were 14,000 check weigher jobs nationally but stated on cross-examination that this number included the total number of sedentary unskilled jobs within the relevant SOC

code. *Viverette*, 13 F.4th at 1319. She also said that she did not know whether the other DOT occupations within the SOC code required level 1 or level 2 reasoning or something higher. *Id.* Thus, in that case, it was clear that the VE may have overstated the number of check weigher jobs. *Id.* In the case at hand, no such similar testimony was elicited from the VE on cross-examination when Plaintiff's counsel had the opportunity to question her.

Finally, Plaintiff's argument that the ALJ should have accounted for the pandemic affecting the number of available jobs is without merit and is not supported by case law in the Motion for Summary Judgment.

In sum, if Plaintiff wished to know the basis for the VE's job numbers and opinions, his counsel, who was present by telephone at the hearing, should have asked more questions of the VE at that time. Because this was not done, Plaintiff is now simply guessing how the VE arrived at her numbers and opinions. Plaintiff's counsel in the Motion for Summary Judgment has basically collated Eleventh Circuit law that is not applicable to the facts of this specific case.

C.  Whether the ALJ Properly Evaluated Plaintiff's Spinal Impairment Pursuant to the Requirements Set Forth under Listing 1.04(A)

Plaintiff asserts that the "ALJ's perfunctory findings that none of the requirements of the listing were met or equaled involved nothing more than a conclusory declaration, which was then followed only by a brief and cursory recitation of the otherwise complex and intricate listing-level criteria. Indeed, the ALJ so much as fails to specify which section of Listing 1.01 might even be applicable here." [DE 27 at 15]. Plaintiff also contends the ALJ's findings are not supported by the substantial evidence of record. *Id.* Plaintiff concedes that an ALJ's finding as to whether a claimant meets a listed impairment may be implied from the record and that an ALJ is not required to recite the evidence leading to a determination regarding the Listings. *Id.* at 18. However, he

argues that the circumstances in this case are different because the ALJ "altogether failed to consider the complexities of [Plaintiff's] multiple impairments." *Id.* Finally, Plaintiff argues that "even if the evidence does not clearly establish [Plaintiff] 'met' a listing, it so close[ly] satisfies the criteria such that the ALJ should have called upon a Medical Expert considering the significant co-morbid impairments." *Id.* According to Plaintiff, the key issue here is that it is not clear from the record that the ALJ properly considered the relevant evidence. *Id.*

In response, Defendant argues that "although Plaintiff had a disorder of the spine, he failed to provide or cite evidence of nerve root compression that simultaneously met all the criteria of Listing 1.04A for the requisite 12-month period." [DE 30 at 20]. Defendant asserts that "as the ALJ discussed, the clinical findings that Plaintiff occasionally demonstrated were interspersed with several normal exams and occasions when Plaintiff did not complain of pain." *Id.* Therefore, Defendant concludes that the medical records "provide substantial evidence that Plaintiff's impairments did not meet or equal all the criteria of subjection A of Listing 1.04." *Id.*

First, the Undersigned has reviewed the entirety of the medical record, which is summarized above. Defendant is correct that Plaintiff has failed to provide or cite evidence of nerve root compression that simultaneously met all the criteria of Listing 1.04A for the requisite 12-month period. Listing 1.04 discusses disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. There must also be

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test

(sitting and supine); or B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04.

In her decision, the ALJ specifically wrote,

Under listing 1.02, the evidence does not demonstrate that the claimant has the degree of difficulty in performing fine and gross movements in both upper extremities as defined in 1.00B2c or the degree of difficulty in ambulating as defined in 1.00B2b. The medical evidence does not establish the requisite evidence of nerve root compression with associated findings on physical examination, spinal arachnoiditis, or lumbar spinal stenosis with inability to ambulate effectively as required under listing 1.04. The most recent exam in the file indicates that a straight leg raising test was negative in both the seated and supine positions; no sensory or reflex loss; or inability to ambulate effectively. (Ex. B26F)

[R. 19]. She also specifically considered Plaintiff's medical record evidence with regard to his spine disorder. [R. 21-26]. Plaintiff concedes in his Motion for Summary Judgment that an ALJ's finding as to whether a claimant meets a listed impairment may be implied from the record and that an ALJ is not required to recite the evidence leading to a determination regarding the Listings. The crux of Plaintiff's argument is that it is not clear from the record that the ALJ properly considered the relevant evidence. The Undersigned has fully reviewed the ALJ's decision and disagrees. As stated above, it is clear from the decision that the ALJ considered—and summarized—the relevant evidence regarding Plaintiff's spinal disorder. The ALJ went above and beyond the barebones requirements and discussed the evidence and her findings in detail.

Second, Plaintiff's argument that "even if the evidence does not clearly establish [Plaintiff] 'met' a listing, it so close[ly] satisfies the criteria such that the ALJ should have called upon a

Medical Expert considering the significant co-morbid impairments," is without merit and is not supported by any case law in the Motion for Summary Judgment. Ultimately, it seems that Plaintiff is improperly asking the Court to reweigh the record evidence, something which the Court cannot do.

D.  Whether the ALJ's RFC Finding Is Supported by Substantial Evidence

Plaintiff argues that the ALJ "cherry-picked the functional restrictions described by the consultative examiner, Jacob Lochner, D.O., which support her theory of the case, rather than what the medical evidence supports." [DE 27 at 19]. Plaintiff points out that the ALJ failed to adopt Dr. Lochner's finding that Plaintiff needs the ability to change position as needed in her RFC. *Id.* Plaintiff also asserts that the ALJ's RFC finding "does not specify how much walking and standing [Plaintiff] can perform for each individual activity and instead impermissibly combines the two activities into 'stand and walk.'" *Id.* Finally, he argues that "because such evidence shows an even greater degree of severity in impairment, warranting even more restrictive functional limitations than the ALJ found, the ALJ's RFC finding is necessarily deficient because it does not take into account all limitations arising from all impairments." *Id.* at 20.

In response, Defendant explains that an ALJ is not required to mention every piece of evidence in a decision. [DE 30 at 20]. Defendant contends that the ALJ did not cherry pick; rather she "evaluated both the normal exam findings and the positive findings, along with the evidence as a whole, in assessing Plaintiff's RFC." *Id.* at 21. Defendant additionally argues that the ALJ was not required to articulate in writing her consideration of the numbers of hours Plaintiff could perform the tasks of standing and walking separately pursuant to SSR 96-8p. *Id.*

First, the Court cannot reweigh the evidence, which appears to be Plaintiff's actual request.

*See Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir. 1983) (a court in a social security appeal case may not "decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the Secretary. Even if [it] find[s] that the evidence preponderates against the Secretary's decision, [it] must affirm if the decision is supported by substantial evidence.").

Second, Social Security Ruling 96–8p provides, in relevant part, that "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis . . . . Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." SSR 96–8p, 1996 WL 374184 at *1 (July 2, 1996). Here, the ALJ considered Plaintiff's functional limitations as they relate to his ability to sit and stand and that finding is supported by the medical record evidence. This is sufficient. *Singleton v. Comm'r of Soc. Sec.*, No. 6:12-CV-683-ORL-GJK, 2013 WL 5236678, at *2–3 (M.D. Fla. Sept. 17, 2013) (affirming the ALJ decision when the ALJ merged the claimant's ability to sit, stand and walk through the workday into one finding). While "SSR 96-8p requires consideration of all evidence, it does not require that the ALJ expressly address each functional ability in her decision." *Eubanks-Glades v. Colvin*, No. 13-60029-CIV, 2013 WL 12104893, at *11 (S.D. Fla. Nov. 5, 2013), *report and recommendation adopted,* No. 13-60029-CIV, 2013 WL 6116810 (S.D. Fla. Nov. 20, 2013). "[W]hile Social Security Ruling 96–8p does require a function-by-function analysis, it does not mandate any specific format." *Zuni v. Astrue*, No. 08-21489-CIV, 2009 WL 2929388, at *4 (S.D. Fla. Sept. 9, 2009).

Third, Step Four of the requisite analysis involves the ALJ's determination as to "(1) the claimant's residual functional capacity ("RFC"); and (2) the claimant's ability to return to past

relevant work." *Phillips*, 357 F.3d at 1238. If a claimant's impairment does not meet or equal a listed impairment, the ALJ's RFC determination rests upon an assessment of "all the relevant medical and other evidence in [the claimant's] case record." 20 C.F.R. § 404.1520(e); *see also* 20 C.F.R. § 404.1545(a)(3). "As for the claimant's RFC, the regulations define RFC as that which an individual is still able to do despite the limitations caused by his or her impairments." *Phillips*, 357 F.3d at 1238. Thus, so long as her RFC is supported by the record evidence, which it is in this case, the ALJ was permitted to adopt some, but not all, functional restrictions described by the consultative examiner, Jacob Lochner, D.O.

## VI. <u>CONCLUSION AND RECOMMENDATION</u>

In light of the foregoing, it is the recommendation of the Undersigned that the decision of the Commissioner be **AFFIRMED**. Further, it is the recommendation of the Undersigned that Plaintiff's Motion for Summary Judgment [DE 27] be **DENIED** and Defendant's Motion for Summary Judgment with Supporting Memorandum of Law and Response to Plaintiff's Motion for Summary Judgment [DE 30] be **GRANTED**. Finally, the Undersigned recommends that a separate judgment be entered in favor of Defendant.

## <u>NOTICE OF RIGHT TO OBJECT</u>

The parties shall have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with United States District Judge Rodney Smith. Failure to file objections timely shall bar the parties from a de novo determination by the District Judge of an issue covered in the Report and Recommendation and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report and Recommendation. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149

(1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

  **RESPECTFULLY SUBMITTED** in Chambers at West Palm Beach, Palm Beach

County, Florida, this 26th day of May, 2022.

*William Matthewman*

WILLIAM MATTHEWMAN
United States Magistrate Judge
